IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTTSDALE INDEMNITY COMPANY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  06-5339 |
| | : | |
| v. | : | |
| | : | |
| HARTFORD CASUALTY INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

MEMORANDUM

BUCKWALTER, S.J.                                                                                           January 10, 2008

Presently before the Court are Defendant's Motion for Summary Judgment (Docket No. 14), Plaintiff's Answer thereto (Docket No. 16), and Defendants' Reply Brief (Docket No. 17); as well as Plaintiff's Motion to Compel (Docket No. 13) and Def.'s Brief in Opposition thereto (Docket No. 15).  For the reasons stated below, Defendants' Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion to Compel is **DENIED**.

I.  INTRODUCTION

Plaintiff, Scottsdale Indemnity Company (Scottsdale), and Defendant, Hartford Casualty Insurance Company (Hartford), were both insurers of Safety Management Services, LLC (SMS).  After SMS was sued by a third party, only Scottsdale contributed to the eventual settlement.  In Count I, Scottsdale seeks declarations that Hartford must reimburse Scottsdale for some of its costs and legal fees, pay two-thirds of Scottsdale's settlement amount, and pay punitive damages.  Scottsdale claims in Count II that Hartford violated its insurance contract

1

with SMS; in Count III, that by acting in bad faith, Hartford is liable for punitive damages, court costs, and attorneys' fees; and in Count IV, that Hartford is liable under a theory of unjust enrichment.

## II. BACKGROUND

SMS is in the business of providing safety inspection services to construction companies. This includes direct inspections of construction sites, as well as giving advice on safety improvements and regulatory compliance. (McDonough Dep. 30:19-31:11, June 2, 2006.) SMS retained two insurance policies to cover its liabilities in this business: (1) a general liability insurance policy from Hartford (Mot. Summ. J. Def. Hartford Casualty Company, Ex. E); and (2) a miscellaneous professional liability policy from Scottsdale. (Id. Ex. D.)

The Hartford policy covered property damage to SMS's office and other property owned by SMS, as well as business liability for "'bodily injury' or 'property damages' . . . caused by an 'occurrence.'" (Id. Ex. E at HO429). The Hartford policy carved out two exceptions to its coverage that are relevant here. The first, the Professional Services Exclusion, excluded from coverage damages "due to the rendering of or failure to render any professional service." (Id. Ex. E at HO435.) Under the terms of the policy, "Professional Services" included "[s]upervisory, inspection, architectural or engineering activities." (Id.) The second exclusion, the Consulting Services Endorsement, excluded from coverage "'bodily injury'" or "'property damage'" arising out of "1. [a]n error, omission, defect or deficiency in . . . an evaluation, a consultation or advice given, by or on behalf of any insured . . . [or] 2. [t]he reporting of or reliance upon any such test, evaluation, consultation or advice." (Id. Ex. E at H0480.)

Robert and Joan Crouse commenced an action against SMS, along with several other defendants, on April 14, 2004. According to the Amended Complaint, Robert Crouse was

2

injured when he fell from a ladder. (Id. Ex. M.)  The Amended Complaint alleged that the ladder was faulty. (Id.)  The construction company Mr. Crouse worked for was SMS's client, and as such SMS had inspected the work site, including the ladder, in the days and weeks prior to the accident. (McDonough Dep. 21-22.)

After learning of the Crouse action, Hartford sent a letter notifying SMS that, in light of the two exclusions outlined above, it disclaimed coverage to the extent that SMS's liability was based on professional services. (Def.'s Mot. Summ. J., Ex F. at H0001-H0002.)  But because the Crouse complaint included claims of general negligence, Hartford agreed, at the outset, to "defend the entire action" and hire an attorney. (Id.)  The letter also indicated that Hartford would withdraw if it determined that SMS's "actions [fell] strictly within the scope of professional services." (Id.)

Thereafter, Hartford had several communications with Scottsdale concerning a joint defense.  The parties dispute what, if anything, was agreed upon in these communications.  It is clear that a representative for Hartford, William Schramm, had a telephone conversation on September 13, 2005, with a representative for Scottsdale, Udayan De. (See id. Ex. H; id. Ex. I.)  Both Schramm and De wrote letters to "confirm," or "memorialize," the agreement made by phone.  In Schramm's letter, dated September 13, 2005, he stated that there was an agreement that the two parties would share defense costs, half each, and the one lawyer already hired by Hartford would serve as joint counsel. (Id. Ex. H.)  In De's letter, dated September 14, 2005, he stated that because he had "been advised" that the Hartford policy had a higher limit, "any indemnity agreement payment will be prorated on a two-third/one-third basis." (Id. Ex. I.)  The letter added, "[I]n order to prevent any potential conflict we have decided to retain separate counsel." (Id.)  De sent another letter on September 23, 2005, that was nearly identical to the

first. (Id. Ex. J.) Schramm never responded to either of De's letters.

Hartford continued to provide counsel to SMS throughout the discovery process. On September 14, 2006, at the conclusion of discovery, the parties to the Crouse action had a settlement conference. (Compl. ¶18.) The lawyer hired by Hartford attended the conference and notified the parties that Hartford would not contribute to the settlement. (Id. ¶ 19.) On September 28, 2006, the Crouses agreed to accept a settlement of $200,000. (Id. ¶ 20.) On September 29, 2006, Scottsdale agreed with the other defendants that it would contribute $75,000 of that amount. (Id. ¶ 21-23.)

### III. LEGAL STANDARD

A motion for summary judgment will be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Because a grant of summary judgment will deny a party its chance in court, all inferences must be drawn in the light most favorable to the party opposing the motion. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).

### IV. DISCUSSION

#### A. The Agreement to Share Costs and Possible Losses

Scottsdale first argues that Scottsdale and Hartford entered into an enforceable agreement after the Crouse litigation commenced. Under this agreement, Scottsdale contends, the parties were to share the costs of defending SMS, including any payments on loss or from a

settlement. "Under Pennsylvania law,[1] the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986).

According to Scottsdale, on September 13, 2005, in a telephone conversation between its representative, De, and Hartford's representative, Schramm, the parties made an agreement with two parts: "first, that the defense cost was to be split equally and, second, that any payment on loss or settlement would be paid [on a two-third/one-third basis]." (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 12.) De's letter "memorializing" this conversation is Scottsdale's only evidence of an agreement to these terms.[2] (See id. at 4-5; 12.) Notably, when

---

[1] Both parties rely on Pennsylvania law in their arguments. Scottsdale, however, suggests that, because SMS was based in Delaware, Delaware law might apply. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 13 n.7.) Under the old Pennsylvania choice of law rules, an insurance contract was governed by the law of the state in which the contract was made or delivered. McMillan v. State Mut. Life Assurance Co. of Am., 922 F.2d 1073, 1074-75 (3d Cir. 1990). Under this rule, Delaware law would apply, because the contract was delivered to SMS in Delaware. (See Ex. E at H0395.) However, the Third Circuit recently held that the Griffith rule, under which a district court must examine the nature of the conflict and the interests of the jurisdictions in determining what law to apply, should apply to contract disputes. Hammersmith v. TIG Ins. Co., 480 F.3d 220, 227-29 (3d Cir. 2007) (discussing Griffith v. United Air Lines Inc., 203 A.2d 796 (Pa. 1964)). In this case, that analysis is simple. First, because there is no dispute between the parties as to which law to apply, we need not examine the issue in detail. See id. at 228 n.4 ("In some . . . cases, the parties did not challenge the applicable law, and thus the Court's choice of law discussion was dictum."). Second, the law of Delaware and Pennsylvania seem to be in agreement on what constitutes the formation of an agreement, which is at issue in this portion of the Court's discussion, and the burden of proof and rules of interpretation of insurance policies, which is considered in Part III.B infra. The Third Circuit stated in Hammersmith, "If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary." Id. at 230. For these reasons, the Court will apply Pennsylvania law.

[2] The relevant portion of the September 14, 2005, letter from De is reprinted in full below:
    This will memorialize our conversation of September 13, 2005, wherein

asked about it, De had no recollection of the conversation. (De Dep. 24:16-18, Aug. 16, 2007.)

The Court concludes that the De letter, standing alone, does not provide sufficient evidence of an enforceable agreement to survive this motion for summary judgement. First, the letter indicates that <u>after</u> the phone conversation, Scottsdale "decided to retain separate counsel." (Def.'s Mot. Summ. J., Ex. H.) Thus, it appears that De changed at least this term after the telephone conversation. Scottsdale's decision to retain separate counsel also conflicted with Schramm's understanding of the agreement, as manifested in his letter of September 13, 2005, wherein he told De that he expected Scottsdale to help pay for the lawyer Hartford had already retained. (<u>Id.</u> Ex. G.) Second, and relatedly, the letter provides little evidence of an agreement on a two-third/one-third split of a settlement or loss. The De letter states, "We have been advised [that] The Hartford policy has [a higher liability limit]. Subsequently it should be noted that any indemnity payment will be prorated on a two-third/one-third basis." (<u>Id.</u> Ex. H.) The

---

    Scottsdale Insurance Company has agreed to provide a defense to our mutual insured. However, it should be noted that our limits are $1,000,000.00, subject to a $1,000,000.00 claim aggregate. We have been advised The Hartford Policy has a $2,000,000.00 primary limit subject to a $4,000,000.00 general aggregate. Subsequently, it should be noted that any Indemnity payment will be prorated on a two-third/one-third basis based on the coinsurance clause if discovery and inspection is unable to conclude if this matter arose out of the operations of any error or omissions of the insured. Subsequently, in order to prevent any potential conflict we have decided to retain separate counsel to address insured's liability arising out of their professional errors and/or omissions. We are in the process of retaining a law firm to represent the insured's professional liability interests in this matter. (So far three firms I have contacted have conflicts) However, we expect to retain a firm by the beginning of next week.
    In the mean time we request that you provide us with the name of defense counsel you have retained so that we may advise them accordingly. It should also be noted that we reserve the right to withdraw from the defense of this matter in the event it is determined that this matter did not arise out of the professional services of the Insured.

(Def.'s Mot. Summ. J., Ex. H.)

asked about it, De had no recollection of the conversation. (De Dep. 24:16-18, Aug. 16, 2007.)

The Court concludes that the De letter, standing alone, does not provide sufficient evidence of an enforceable agreement to survive this motion for summary judgement. First, the letter indicates that <u>after</u> the phone conversation, Scottsdale "decided to retain separate counsel." (Def.'s Mot. Summ. J., Ex. H.) Thus, it appears that De changed at least this term after the telephone conversation. Scottsdale's decision to retain separate counsel also conflicted with Schramm's understanding of the agreement, as manifested in his letter of September 13, 2005, wherein he told De that he expected Scottsdale to help pay for the lawyer Hartford had already retained. (<u>Id.</u> Ex. G.) Second, and relatedly, the letter provides little evidence of an agreement on a two-third/one-third split of a settlement or loss. The De letter states, "We have been advised [that] The Hartford policy has [a higher liability limit]. Subsequently it should be noted that any indemnity payment will be prorated on a two-third/one-third basis." (<u>Id.</u> Ex. H.) The

---

    Scottsdale Insurance Company has agreed to provide a defense to our mutual insured. However, it should be noted that our limits are $1,000,000.00, subject to a $1,000,000.00 claim aggregate. We have been advised The Hartford Policy has a $2,000,000.00 primary limit subject to a $4,000,000.00 general aggregate. Subsequently, it should be noted that any Indemnity payment will be prorated on a two-third/one-third basis based on the coinsurance clause if discovery and inspection is unable to conclude if this matter arose out of the operations of any error or omissions of the insured. Subsequently, in order to prevent any potential conflict we have decided to retain separate counsel to address insured's liability arising out of their professional errors and/or omissions. We are in the process of retaining a law firm to represent the insured's professional liability interests in this matter. (So far three firms I have contacted have conflicts) However, we expect to retain a firm by the beginning of next week.
    In the mean time we request that you provide us with the name of defense counsel you have retained so that we may advise them accordingly. It should also be noted that we reserve the right to withdraw from the defense of this matter in the event it is determined that this matter did not arise out of the professional services of the Insured.

(Def.'s Mot. Summ. J., Ex. H.)

language implies that this specific division of liabilities was not discussed in the phone conversation. Indeed, Schramm testified that this term was not discussed in their conversation. (Schramm Dep. 28:20-23.) Even on its own, then, this letter does not merely memorialize a telephone conversation; rather, it adds or changes terms.

These letters indicate that there was no meeting of the minds and that material terms of a potential agreement were disputed and unclear. No court could conceivably enforce the terms of this agreement because they are not definite. See Channel Home Ctrs. v. Grossman, 795 F.2d at 299 (concluding that to be enforceable an agreement must be "sufficiently definite to be specifically enforced"). There is no further evidence that could possibly be produced.[3] The only clarity in the letters is that the parties had different views on how the companies could work together. Given this, it is no surprise that the parties retained separate counsel and took no further steps to combine resources.

The Court concludes that no reasonable jury could find, based purely on De's letter, that the parties had entered into an enforceable agreement. Therefore, to the extent that Scottsdale's claims rely on such an agreement, they must be dismissed.

**B. The Professional Services and Consultation Exclusions**

Hartford argues that it had no duty to defend or contribute to the Crouse settlement because the Professional Services Exclusion and/or the Consulting Services Endorsement applied to the Crouse litigation. Scottsdale, on the other hand, contends neither of

---

[3] Scottsdale also has pending a Motion to Compel Compliance with Plaintiff's Second Request for Production of Documents (Docket No. 13). However, the documents requested would provide no further evidence as to an agreement between Schramm and De. This motion is considered in further detail in Note 6 infra.

these exclusions applied and, therefore, Hartford did have such a duty.

The Court therefore must interpret the meaning of these two exclusions. At the outset, we note that while the burden is on the insured to demonstrate a valid policy claim, Riehl v. Travelers Ins. Co., 772 F.2d 19, 23 (3d. Cir. 1985), the burden is on the insurer to establish an exclusion's applicability. Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1366 (Pa. 1987).

More generally, a court must enforce provisions of an insurance contract that are clear and unambiguous. If possible, "a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions." Little v. MGIC Indem. Corp., 836 F.2d 789, 793 (3d Cir. 1987); see also Northbrook Ins. Co. v. Kuljian Corp., 690 F.2d 368, 372 (3d Cir. 1982) ("'A court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them.'" (quoting St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981)). A provision is ambiguous "'if the policy provision is reasonably susceptible to more than one interpretation.'" Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (quoting McMillan v. State Mut. Life Assur. Co., 922 F.2d 1073, 1074 (3d Cir. 1990). In other words, "[a] provision of an insurance policy is ambiguous if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning." Northbrook Ins. Co., 690 F.2d at 372 (quoting Celley v. Mut. Benefit Health & Accident Ass'n, 324 A.2d 430, 434 (Pa. Super. Ct. 1974)). If the court finds an ambiguity, the policy "must be construed against the insurer and in favor of the insured; any reasonable interpretation offered by the insured, therefore, must control." McMillan, 922 F.2d at 1075.

The two exclusions are next considered in turn.

### 1. The Professional Services Exclusion

The Third Circuit has defined professional services as follows:

> Something more than an act flowing from mere employment or vocation . . . [t]he act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" . . . means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

Harad v. Aetna Cas. & Surety Co., 839 F.2d 979, 984 (3d Cir. 1988) (internal quotation marks and citations omitted).

The question here is whether SMS's actions that were the basis of its liability in the Crouse matter constituted professional services. This Court concludes, following Continental Casualty Co. v. Hartford Accident & Indemnity Co., 836 F. Supp. 246 (E.D. Pa. 1993), that SMS did not render professional services. The facts of Continental are very similar to the facts here. Two insurers, one providing a general business liability policy and the other a professional services liability policy, disputed whether they should have shared the costs of defending the insured, which was a company accused of failing to properly inspect a construction site. Id. at 247. As in this case, the general policy had a professional services exclusion. Id. The district court held that the exclusion did not apply because the inspections were not "professional services." Id. at 250. The court identified several factors that led it to this conclusion: (1) the "inspection services were overseen by [someone] who had a high school education and no engineering training;" (2) although another inspector had a "bachelors degree

9

in engineering, [she] was working as an inspector, rather than as a civil engineer;" (3) "[T]he safety role actually played" by the insured "was limited to reporting safety infractions to the job foreman when they were noticed;" (4) there were others who had ultimate responsibility for safety at the job site; and (5) this limited conception of the insured's roll in the safety inspection was "call[ed] for" by its contract. Id. at 249-50. All these factors are also present here.[4] The actual inspector, Sherry Phillips, had limited training, consisting of two classes for six to eight weeks, in addition to two years of working under Jim McDonough, SMS's proprietor. (Phillips Dep. 15-25, June 2, 2006.) Her role was merely to point out safety violations; she did not have the authority to make the changes herself. (McDonough Dep. 56:3-7.) This was the extent of SMS's contractual obligations. (See id.; Pl.'s Mem. Opp'n 6-7.)[5] Even McDonough did not

---

[4] Scottsdale attempts to distinguish this case from Continental by arguing that, in Continental, the contracted-for inspection services were not "safety" inspections. (See Reply Br. Further Supp. Def.'s Mot. Summ. J. 7-8.) Scottsdale argues that the insured in Continental inspected the construction site only to ensure that its client adhered to the terms of its contract. (Id.) However, the Continental court found that there was at least some safety aspect to the inspections. Continental, 836 F. Supp. at 250 ("The safety role actually played by Kimball was limited to reporting safety infractions to the job foreman when they were noticed by Kimball employees. Thus, it is clear to the court from the undisputed facts that Kimball was not performing professional safety inspection services at the construction site." (emphasis added and citation omitted)). The key facts were that the safety aspect of the insured's duties did not require great expertise, and that the insured had no control or ultimate responsibility over whether its safety recommendations were implemented.

Scottsdale also cites to Penn. Nat'l Mut. Cas. Co. v. Boxmeyer, 68 Pa. D. & C.4th 102, in support of its claim that safety inspections constitute professional services. In that case, however, the court did not find that the insured was engaged in professional services based on a finding that it performed safety inspections, as Scottsdale asserts; instead, the court concluded that the insured was a surveyor, which was also within the ambit of the professional services exclusion. Id. at 106.

[5] There was no written contract between the construction company and SMS. (See Pl.'s Mem Opp'n 6-7.) However, the evidence demonstrates that the oral agreement that was entered into between the construction company and its client left ultimate responsibility for safety with the primary contractor. (Id.)

understand the services SMS offered to be professional services. (See McDonough Dep. 56:20-57:16.)

Although a close question, the Court concludes that what SMS provided was something less than a "vocation" or "calling" and was closer to a "proficiency in the performance of a task." See Harad, 839 F2d at 984.  Therefore, the professional services exclusion does not apply.

### 2. The Consulting Services Endorsement

The Consulting Services Endorsement, on the other hand, applies to the facts here.  The Consulting Endorsement was as follows:

> EXCLUSION – TESTING OR CONSULTING ERRORS AND OMISSIONS
> . . .
> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:
> 1. An error, omission, defect or deficiency in:
>    a. Any test performed; or
>    b. An evaluation, a consultation or advice given,
>    by or on behalf of any insured;
> 2. The reporting of or reliance upon any such test, evaluation, consultation or advice; . . .

(Def.'s Mot. Summ. J., Ex. E at H0480.)  Clearly, to the extent that SMS's liability derived from its failure to identify and inform the construction company as to the faulty ladder, this was an "error, omission, defect or deficiency in" an "evaluation" or "consultation."  There is no ambiguity in the plain meaning of this provision, and the Court will not torture the language to find such an ambiguity. See Northbrook Ins. Co. v. Kuljian Corp., 690 F.2d 368, 372 (3d Cir. 1982) ("A court should read policy provisions to avoid ambiguities, if possible, and not torture

the language to create them." (internal quotation marks omitted)).

Scottsdale does not argue that the language is ambiguous; rather it makes two other arguments. First, according to Scottsdale, this exclusion is nothing more than a subset of the professional services exclusion, a mere explication. (Pl.'s Mem Opp'n 22-23.) To support this conclusion, Scottsdale argues that Hartford itself understood the Consulting Endorsement in this way. It points to Hartford's communications regarding the exclusion as evidence—where, often times, Hartford seemed to conflate the two. (Id.) However, because the language is clear on the face of the agreement, the Court need not examine this extrinsic evidence.[6] See Allstate Indem. Co. v. Coroniti, Nos. 06-3051, slip op. at 1 (3d Cir. Oct. 24, 2007) ("The law of this circuit is clear that when the written contract is clear and unequivocal, there is no need to resort to extrinsic evidence." (citing Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001))). Even if we did examine the evidence, it is unconvincing. In its initial letter to SMS after the Crouse litigation commenced, Hartford separately identified both the Professional Services Exclusion and the Consulting Services Endorsement, and disclaimed coverage to the extent that these exclusions applied. (Def.'s Mot. Summ. J., Ex. H.) The mere

---

[6] In Scottsdale's Motion to Compel Compliance with Plaintiff's Second Request for Production of Documents (Docket No. 13), Scottsdale requests in all but Request 3 various documents that would shed light on the meaning of its policy covering SMS, in particular what Hartford considered professional services. (See Mem Supp. Pl.'s Mot. Compel Compliance Pl.'s Second Request for Production of Documents 2-5.) Because this Court agrees with Scottsdale, on the basis of the present record, that SMS's actions did not constitute professional services, these documents are unnecessary. Additionally, because the Consulting Services Endorsement is not ambiguous, there is no need to examine these extrinsic documents as they relate to that provision. See Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001). Therefore, Requests 1, 2, and 4 are denied. In Request No. 3, Scottsdale seeks documents concerning Hartford's decision to cancel the SMS policy. The cancellation decision, made after the events giving rise to this case, is not relevant here. Therefore, Scottsdale's Motion to Compel is denied.

fact that, at other times, Hartford referred to both under the label of "professional services" does not render the Consulting Services Endorsement meaningless. See Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) ("[A] court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions." (emphasis added) (internal quotation marks omitted)).  Clearly, Hartford was using shorthand, which is understandable since the Endorsement was, effectively, an exclusion for similar pseudo-professional services.[7]

In further support of this first argument, Hartford also cites GRE Insurance Group v. Metropolitan Housing, Partnership, 61 F.3d 79 (1st Cir. 1995).  There, the court considered a provision excluding claims "arising out of the rendering or failure to render any professional services by or for you, including . . . supervisory, inspection or engineering services." Id. at 84. The question in that case was whether the clause excluded all inspection services or just professional inspection services. Id.  The court concluded, "By its own plain terms, the endorsement excludes coverage for a broad category—professional services—and then specifies types of excluded professional services as examples."  Unlike in GRE, here, the Consulting Endorsement is not an example within the Professional Services Exclusion; rather, it is an entirely separate exclusion, in an entirely separate section of the policy.  Therefore, GRE does not provide support for Scottsdale's argument.

Scottsdale's second argument is that Mr. Crouse's injury "did not 'arise' out of an error or omission in SMS's non-professional evaluation or consultation." (Pl.'s Mem Opp'n 24.)

---

[7] It is not relevant that Hartford did not immediately disclaim coverage and demonstrated some unsureness as to whether it had a duty to defend SMS. (See Pl.'s Mem. Opp'n 20-22.) Hartford should not be punished for closely examining the facts and, in caution, providing an attorney to SMS for the preliminary stages of the litigation.

Essentially, this amounts to an argument that SMS had no liability in the underlying case. (Id.) We note first that, "when [an] underlying lawsuit settles without [a] finding of liability, and [a] dispute over insurance coverage arises thereafter, [a] court must use available evidence to determine [the] basis for liability." Cont'l Cas. Co. v. Hartford Accident & Index. Co., 836 F. Supp. 246, 247 (E.D. Pa. 1993) (citing Cooper Labs. v. Int'l Surplus Lines, 802 F.2d 667, 673-74 (3d Cir. 1986)).  The evidence is clear that SMS's only responsibility on the construction site where Mr. Crouse was injured was to perform safety inspections.  It could only have been in this role that SMS was liable.  Therefore, the Court concludes that to the extent that SMS was liable, it did "arise out of" an "error, omission, defect or deficiency in" an "evaluation" or "consultation."  Furthermore, Scottsdale cannot now argue that SMS had no liability whatsoever.  This is not the venue for Scottsdale and SMS to make that claim.

**V.  CONCLUSION**

Because the Consulting Services Endorsement applies, Hartford had no contractual obligation to defend SMS or contribute to the settlement (Counts I and II).  Because there was no duty, Hartford cannot be liable for acting in bad faith (Count III).  Nor did it gain any benefit by Scottsdale providing SMS's defense and contributing to the settlement, and thus there was no unjust enrichment (Count IV).  Therefore, judgment is entered in favor of Hartford, and against Scottsdale, on all counts.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTTSDALE INDEMNITY COMPANY, | : | CIVIL ACTION |
| Plaintiff, | : | NO. 06-5339 |
| v. | : | |
| HARTFORD CASUALTY INSURANCE COMPANY, | : | |
| Defendant. | : | |

## ORDER

AND NOW, this 10th day of January, 2008, upon consideration of Defendant's Motion for Summary Judgment (Docket No. 14), Plaintiff's Answer thereto (Docket No. 16), and Defendant's Reply Brief (Docket No. 17), it is hereby **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**.

It is further **ORDERED**, on consideration of Plaintiff's Motion to Compel (Docket No. 13) and Def.'s Brief in Opposition (Docket No. 15), that Plaintiff's Motion to Compel is **DENIED**.

**JUDGMENT** is **ENTERED** in favor of Hartford Casualty Insurance Company, and against Scottsdale Indemnity Company, on all counts.

This case is **CLOSED**.

BY THE COURT:

*s/ Ronald L. Buckwalter, S. J.*
RONALD L. BUCKWALTER, S.J.